## THOMAS COSTANZO *v.* F. SCOTT GRAY ET AL.
### (AC 29228)

Bishop, McLachlan and Beach, Js.

Argued October 22, 2008—officially released February 17, 2009

*Philip F. von Kuhn*, for the appellant (plaintiff).

*Richard A. O'Connor*, with whom was *S. Peter Sachner*, for the appellees (named defendant et al.).

BEACH, J. The plaintiff, Thomas Costanzo, appeals from the judgment of the trial court rendered after a jury trial in favor of the defendants F. Scott Gray, an orthopedic surgeon, and his employer, Connecticut Family Orthopedics, P.C.[1] On appeal, the plaintiff claims that the court improperly (1) precluded a medical pamphlet from being admitted as a full exhibit, (2) precluded him from questioning a witness regarding the standard of care for keeping medical records, (3) refused to set aside the verdict on the battery count and (4) refused to set aside the verdict on the medical malpractice count. We disagree and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In late 2002, the plaintiff, complaining of pain in his lower back, presented himself to Gray. Gray determined that the plaintiff was suffering from a left side herniated disc in his lumbar spine. In early 2003, after conservative treatments proved unsuccessful in treating the plaintiff's back pain, Gray recommended that he undergo surgery to repair the disc. At the preoperative visit, Gray proposed performing the surgery using the METRx retractor system. The METRx system is designed to minimize recovery time by allowing the operating surgeon to split the muscles to gain access to the disc rather than having to peel them away.

Prior to the surgery, the plaintiff signed a consent form, authorizing a "left L4-L5 microdiscectomy" using the METRx retractor. Following the preoperative visit, but prior to the surgery, Gray submitted a medical history form in which he described the plaintiff's chief

---

[1] Danbury Hospital, Danbury Office of Physicians Services, P.C., and Ellen Judith Brand also were defendants in this action, but claims against them were withdrawn from the case. Hereinafter, references to the defendants are to Gray and Connecticut Family Orthopedics, P.C.

complaint as "[c]hronic history of low back pain and right leg discomfort with a large right-sided L4-L5 disc herniation by MRI [magnetic resonance imaging] scan." After the surgery, Gray wrote an operative report in which he described both the preoperative and postoperative diagnosis as "[r]ight-sided herniated [disc], L4-L5." Later, at an office visit following the surgery, Gray noted that he operated on the right side of the plaintiff's back "[b]ecause so many of his symptoms were on the right side . . . ." At trial, the plaintiff stated, and Gray admitted, that the plaintiff never complained to Gray of any right sided symptoms, nor did he have a right sided herniation.

Following the procedure, the plaintiff's symptoms did not improve and further surgery was performed on his back. The plaintiff subsequently brought this action against the defendants. In his operative complaint, the plaintiff alleged medical malpractice and battery as to the defendants. The plaintiff alleged, inter alia, that Gray "acted negligently and carelessly" when "[a] he performed surgery on the wrong side of the plaintiff's back; [b] he surgically removed disc material on the plaintiff's right side at the L4-L5 level when there was no herniation present and removal of such material was unwarranted; [c] he performed a right L4-L5 microdiscectomy when he did not have consent to do so; and [d] he failed to perform a left L4-L5 microdiscectomy." The battery count alleged that Gray committed battery by operating on the right side of the plaintiff when the plaintiff consented to an operation on the left side of his spine.

At trial, Gray admitted that he incorrectly had written, at various points described previously, that the plaintiff was suffering from right side back pain. He defended his decision to operate on the right side of the plaintiff's back, however, by stating that he chose to remove material from the right side to create a space for the bulge

on the left side to sink back into place. The plaintiff's expert testified that Gray's approach did not meet the applicable standard of care. The defendants' expert testified that Gray did indeed perform a left microdiscectomy but that he used a right sided approach. The defendants' expert further testified that such an approach, also called a contralateral approach, is within the applicable standard of care. The jury found in favor of the defendants. This appeal followed. Additional facts will be set forth as necessary.

I

The plaintiff first claims that the court improperly ruled that a manufacturer's pamphlet could not be admitted as a full exhibit. We disagree.

The following additional facts are relevant to our resolution of the plaintiff's claim. At trial, Gray testified that he used a Krames pamphlet to describe the proposed surgery to the plaintiff.[2] Gray stated that he used the Krames pamphlet because it depicted the procedure using the contralateral approach and "there are no documents for the [METRx] procedure itself that are like this that are helpful." When asked if he ever gave Medtronic pamphlets regarding the METRx discectomy procedure to his patients, Gray responded: "There's nothing that I have that I give patients . . . I don't recall it offhand, no." The plaintiff's counsel subsequently questioned Gray about a pamphlet published by Medtronic, manufacturers of the METRx system that was employed by Gray during the plaintiff's surgery. Gray responded that he "might have" seen the Medtronic pamphlet before and that "[m]ost of the time" he does not give it to patients. The defendants' counsel objected when the plaintiff's counsel attempted to question Gray about a prior patient, who was involved in a

---

[2] Krames is a company that makes pamphlets, manuals and other medical education materials.

separate medical malpractice action against Gray, to whom he believed Gray had shown the Medtronic pamphlet prior to a microdiscectomy on that patient. The defendants' stated reasons for the objection, communicated outside of the presence of the jury, were relevance and risk of unfair prejudice in calling as a witness a patient who is a plaintiff in a separate malpractice action against Gray. The defendants' counsel also stated that the Medtronic pamphlet, which depicted a same sided approach, as opposed to a contralateral approach, would be unfairly prejudicial because jurors might interpret the illustration to be evidence of the proper approach for the procedure as suggested by the manufacturer. The plaintiff sought to admit the Medtronic pamphlet as a full exhibit as being relevant to Gray's credibility. Gray had stated earlier that there were no useful documents for the METRx procedure and that he did not believe he gave them to his patients. The court sustained the objection. It stated: "[T]here may be another way to attack his credibility, without the use of this specific document being put into evidence, which I have some trouble with." The court specifically left open the possibility that the plaintiff could attack Gray's credibility by calling a witness to testify that Gray had utilized the Medtronic pamphlet during prior consultations.

Review of the court's ruling is governed by the abuse of discretion standard. "The trial court's ruling on the admissibility of evidence is entitled to great deference. . . . [T]he trial court has broad discretion in ruling on the admissibility . . . of evidence . . . [and its] ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion." (Internal quotation marks omitted.) *Jacobs* v. *General Electric Co.*, 275

Conn. 395, 406, 880 A.2d 151 (2005). Furthermore, "[b]efore a party is entitled to a new trial because of an erroneous evidentiary ruling, he or she has the burden of demonstrating that the error was harmful. . . . The harmless error standard in a civil case is whether the improper ruling would likely affect the result. . . . When judging the likely effect of such a trial court ruling, the reviewing court is constrained to make its determination on the basis of the printed record before it. . . . In the absence of a showing that the [excluded] evidence would have affected the final result, its exclusion is harmless." (Internal quotation marks omitted.) *Desrosiers* v. *Henne*, 283 Conn. 361, 366, 926 A.2d 1024 (2007).

The plaintiff's only stated reason at trial for seeking the admission of the pamphlet was to impeach the credibility of Gray on the issue of whether there was a pamphlet from the manufacturer of the METRx system available to give to patients.[3] Only later did the plaintiff extend the issue to question as well Gray's testimony regarding why he chose a contralateral approach in the microdiscectomy procedure.[4] The court acted within its discretion to balance the use of the pamphlet for

[3] At trial, the plaintiff's counsel specifically was asked by the court whether he was seeking to admit the Medtronic pamphlet for the purpose of demonstrating that the contralateral approach was incorrect, to which the plaintiff's counsel replied: "No, Your Honor, I want it admitted for credibility purposes. The purpose in offering it is for credibility purposes, the doctor's—this doctor's testified as to [the issue of the proper medical procedure] and our expert and their expert will testify as to that issue. I'm not offering it for that purpose."

[4] In his brief before this court, the plaintiff expands the scope of his credibility argument. At trial he stated that the purpose of admitting the pamphlet was to impeach Gray's credibility regarding the existence of the pamphlet and not to reach the issue of the proper medical procedure. In his brief, the plaintiff now states that "the existence of the Medtronic pamphlet was relevant to a much larger credibility issue," namely, whether Gray "actually performed the first surgery on the right side because of the danger a left sided approach would have posed using the Medtronic METRx retractor system." This court does not reach evidentiary claims not presented to the trial court.

credibility purposes against the concern that the diagram in the pamphlet would be unduly prejudicial and subject to misuse by the jury.[5] The plaintiff's stated purpose for seeking to admit the pamphlet concerned the credibility issue surrounding its existence. The court permitted the plaintiff to question Gray about the existence of the pamphlet. The court also stated that it would permit the plaintiff to call a witness to testify that Gray had given the witness the Medtronic pamphlet prior to a microdiscectomy procedure. The plaintiff never called such a witness.[6] We conclude that the court did not abuse its discretion in precluding the Medtronic pamphlet from being admitted as a full exhibit.

[5] The plaintiff claims that the defendants' argument regarding the risk of unfair prejudice resulting from the depiction in the pamphlet of the same sided approach was not raised until a posttrial motion. This argument, however, was before the court when it originally ruled on the objection. Notably, while explaining his objection to the admission of the Medtronic pamphlet, the defendants' counsel stated: "And, the further objection I have is exactly what [the plaintiff's] counsel is suggesting here, that he's going to, you know, that even though now he's not going to argue, that this was showing the appropriate approach, he's trying to argue—I mean, he's trying to put that before the [jurors] so they can misuse it, and in that sense, it's inappropriate to do that and the document would be hearsay as to that." Though he couches it in terms of a hearsay objection at the end, it is clear that the defendant was concerned that the jury would misuse the depiction in the pamphlet showing the same sided approach and that this carried a risk of unfair prejudice.

[6] The plaintiff argues that he did not need to call a witness to testify that Gray utilized the Medtronic pamphlet in conjunction with a prior microdiscectomy procedure because Gray effectively admitted as much at trial. Specifically, the plaintiff refers to the following exchange between his counsel and Gray, referring to the Medtronic pamphlet:

"[The Plaintiff's Counsel]: Doctor, in fact, don't you give that to patients, upon whom you're going to do a microdiscectomy using the [METRx] system?

"[The Witness]: Most of the time, I do not."

The plaintiff claims that this implied admission by Gray that he utilizes the Medtronic pamphlet *some of the time* eliminated the need to call a separate witness. Although the plaintiff may be correct, this also supports the defendants' claim that the pamphlet did not need to be admitted as a full exhibit to serve the purpose of impeaching Gray's credibility regarding its existence or Gray's knowledge of its existence.

## II

The plaintiff next claims that the court improperly precluded him from questioning Gray and the defendants' expert regarding the standard of care for keeping medical records. We disagree.

The following additional facts are relevant to our resolution of the plaintiff's claim. On cross-examination, the plaintiff's counsel asked Gray whether he would agree that "it's a breach of the standard of care to incorrectly report a history and physical examination to Danbury Hospital for a patient who you're admitting there for surgery?" The defendants' counsel objected on the ground that the standard of care for record keeping was beyond the scope of the allegations in the complaint. The court sustained the objection on this ground and also because Gray had not been disclosed as an expert on the subject of record keeping. Similarly, on cross-examination, the plaintiff's counsel asked the defendants' expert, Michael Murphy, an orthopedic surgeon, about the standard of care for keeping medical records and whether it is important that a physician keep accurate and complete medical records. The defendants objected on the same grounds and the court again sustained the objection. Subsequently, the plaintiff's counsel asked Murphy whether "the standard of care requires that a doctor accurately, report the history and physical examination, to the hospital, in advance of the surgery." The defendants again objected on the same grounds, which were that this was beyond the scope of the complaint and that the witness was not disclosed on this issue, and the court sustained the defendants' objection.

The court's ruling is governed by the abuse of discretion standard. "It is well established that [t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's

discretion. . . . Concerning expert testimony specifically, the trial court has wide discretion in ruling on the admissibility of expert testimony and, unless that discretion has been abused or the ruling involves a clear misconception of the law, the trial court's decision will not be disturbed. . . . Expert testimony should be admitted when: (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." (Internal quotation marks omitted.) *Al-Janet, LLC* v. *B & B Home Improvements, LLC*, 101 Conn. App. 836, 845, 925 A.2d 327, cert. denied, 284 Conn. 904, 931 A.2d 261 (2007).

The plaintiff argues that the evidence that Gray breached the standard of care for medical record keeping was relevant to the plaintiff's claim that Gray mistakenly operated on the wrong side of his back as well as to the credibility of the defendants' claim that Gray was aware of the inaccurate records but performed the surgery without correcting them. The defendants argue that evidence regarding the standard of care for medical record keeping was not relevant because it was beyond the scope of the allegations in the complaint.[7] We agree with the defendants.

The plaintiff's operative complaint made specific allegations as to how the defendants were responsible for the plaintiff's injuries. None of the allegations pertains to improper record keeping. "[T]o prevail in a medical malpractice action, the plaintiff must prove (1) the requisite standard of care for treatment, (2) a deviation from that standard of care, and (3) a causal connection between the deviation and the claimed injury. . . . Generally, the plaintiff must present expert testimony

---

[7] The defendants also note that neither Gray nor Murphy were disclosed as experts on record keeping.

in support of a medical malpractice claim because the requirements for proper medical diagnosis and treatment are not within the common knowledge of laypersons." (Citation omitted; internal quotation marks omitted.) *Boone* v. *William W. Backus Hospital*, 272 Conn. 551, 567, 864 A.2d 1 (2005). Establishing the applicable standard of care is essential to a medical malpractice claim. In this case, all of the plaintiff's allegations concerned a deviation from the applicable standard of care in that Gray operated on the wrong side of the plaintiff's spine. The allegations were specific to the surgery and did not mention record keeping.

The plaintiff argues that "[i]f the jury heard that the standard of care required the submission of an accurate history and physical to the hospital, the failure of [Gray] to correct the erroneous history and physical would have had a clear tendency to support [the] plaintiff's claim that [Gray] was unaware of his mistake and that he operated on the wrong side." The court, however, did permit evidence that Gray made erroneous entries in the plaintiff's records on at least three occasions. Gray himself even admitted that he incorrectly included inaccuracies in the plaintiff's records and that he was embarrassed by this. The court also permitted evidence on the importance of keeping accurate medical records, though not with specific reference to a specific standard of care. The plaintiff's counsel was permitted to ask Murphy whether he would agree "that it is very important for a physician . . . to keep records as accurate[ly] and completely as possible," to which Murphy responded: "In general, yes." Counsel also asked Murphy whether, in his own practice, he would try to keep records as accurately as possible, whether he would try to fix typographical errors in records and whether he writes important information in records. Murphy responded in the affirmative to all of these queries. Therefore, precluding standard of care evidence as to

medical record keeping did not prevent the jury from hearing other evidence regarding the accuracy of the medical records in this case and, more broadly, the importance of keeping accurate records. On the contrary, the jury was able to hear the facts presented on this topic but not whether Gray's actions violated a standard of care. Accordingly, even if the evidence marginally was relevant as to credibility under the plaintiff's theory, we conclude that the court acted within its discretion to limit the standard of care evidence to the issues raised in the complaint because it admitted other evidence on the issue and the importance of accurate record keeping.

## III

The plaintiff next claims that the court improperly denied his motion to set aside the verdict on the battery count because the defendants' expert stated that Gray did not "technically" perform the procedure to which the plaintiff consented. We disagree because there was sufficient evidence from which the jury reasonably could have reached its decision.

We begin with the standard of review. "The standard of review governing our review of a trial court's denial of a motion to set aside the verdict is well settled. The trial court possesses inherent power to set aside a jury verdict [that], in the court's opinion, is against the law or the evidence. . . . [The trial court] should not set aside a verdict [when] it is apparent that there was some evidence [on] which the jury might reasonably reach [its] conclusion, and should not refuse to set it aside [when] the manifest injustice of the verdict is so plain and palpable as clearly to denote that some mistake was made by the jury in the application of legal principles. . . . Ultimately, [t]he decision to set aside a verdict entails the exercise of a broad legal discretion . . . that, in the absence of clear abuse, we shall not

disturb." (Internal quotation marks omitted.) *Jackson v. Water Pollution Control Authority*, 278 Conn. 692, 702, 900 A.2d 498 (2006).

At trial, the defendants' counsel asked Murphy to explain testimony he gave at his deposition that Gray did not "technically" perform a left L4-L5 microdiscectomy. Murphy responded: "I think that he did perform a left sided microdiscectomy but through a different approach. Technically, I think the term would indicate that he did the approach from the left side, and that would not be accurate, because obviously, he did it from the right side." On the basis of the foregoing testimony, the plaintiff argues that a left L4-L5 microdiscectomy is different from a left sided L4-L5 microdiscectomy and that because the plaintiff consented to a left L4-L5 microdiscectomy but received a left sided L4-L5 microdiscectomy, Gray committed battery.[8]

At the outset, we note that it is not clear from Murphy's testimony in his deposition that he thought there was a distinction between a left and a left sided L4-L5 microdiscectomy as the plaintiff claims, and the testimony is somewhat confusing. Furthermore, even if the plaintiff's interpretation of this statement is accurate, there was ample evidence from which the jury reasonably could have concluded that Gray performed the procedure to which the plaintiff consented. When the plaintiff's counsel asked Murphy whether Gray had "technically" performed a right sided discectomy, he responded: "I would say no." When the defendants' counsel asked Murphy to identify the surgery that Gray performed, he responded: "That surgery was a—a left L4-5 microdiscectomy, that was performed through a

---

[8] "[A] patient can recover for assault and battery when the physician . . . performs a different procedure from the one for which consent has been given . . . ." *Godwin* v. *Danbury Eye Physicians & Surgeons, P.C.*, 254 Conn. 131, 137, 757 A.2d 516 (2000).

right sided approach." The following exchange at trial, between the defendants' counsel and Murphy, also provides a reasonable basis for the jury's conclusion that Gray performed the procedure to which the plaintiff consented:

"Q. Do you have an opinion, as to a reasonable degree of medical probability, as to whether the procedure, that Dr. Gray performed, is the same procedure designated on that consent form?

"A. Yes, I believe it is.

"Q. And why is that?

"A. Well, I believe that, again, he attempted to do a left sided microdiscectomy, but simply, through a right sided approach, instead of a left sided approach.

"Q. And when you say, right sided approach, is that— in this case, is that a contralateral approach?

"A. In this case, that would be contralateral, yes.

"Q. [D]o you have an opinion, to a reasonable degree of medical probability, whether the performance of a right hemilaminotomy, made this anything other than a left L4-5 microdiscectomy?

"A. No, sir."

Gray also testified that prior to the surgery, he described the procedure to the plaintiff in terms of the contralateral approach and that the plaintiff consented to this procedure. Specifically, Gray testified that he used the Krames pamphlet to demonstrate the contralateral approach and that he did not, at any time, "indicate to [the plaintiff] that [he] would be taking a surgical approach to come in on the side of the herniation."

On the basis of the foregoing testimony provided by the defendants' expert, as well as testimony from Gray himself, there was sufficient evidence from which the

jury reasonably could have reached its verdict. Gray testified that he had described the contralateral approach to the plaintiff and obtained his consent for this procedure. Murphy testified that the procedure that Gray performed was the procedure to which the plaintiff had consented. Also, Murphy did not draw any clear distinction between a left L4-L5 microdiscectomy and a left sided L4-L5 microdiscectomy. On the contrary, he appeared to use the two terms interchangeably. He did distinguish between left sided approaches and right sided approaches. Therefore, we conclude that the court did not abuse its discretion in denying the plaintiff's motion to set aside the verdict.[9]

## IV

The plaintiff's final claim is that the court improperly denied his motion to set aside the verdict on the medical negligence count because it was a breach of the standard of care for Gray to employ the contralateral approach when he was concerned that there was a free fragment present on the left. We disagree.

The following additional facts are relevant to our resolution of the plaintiff's claim. Murphy testified at his deposition, and again at trial, that it would be a breach of the standard of care to employ the contralateral approach if Gray was even suspicious of the presence of a free fragment on the left. In an orthopedic form completed prior to the surgery, Gray wrote that the plaintiff's disc herniation was "probably in part free fragment." Gray, however, testified that prior to the surgery, he spoke with a radiologist and eventually agreed with the radiologist's report, which did not show the presence of a free fragment.

---

[9] Ordinarily, it is the plaintiff's burden to prove lack of consent by a preponderance of the evidence. See *Gemme* v. *Goldberg*, 31 Conn. App. 527, 540, 626 A.2d 318 (1993). Absent a binding admission or other preclusive event, a jury finding in favor of the party without the burden ordinarily would not be set aside.

We will not disturb a court's ruling on a denial of a motion to set aside a verdict absent a clear abuse of discretion. "The trial court possesses inherent power to set aside a jury verdict [that], in the court's opinion, is against the law or the evidence. . . . [The trial court] should not set aside a verdict [when] it is apparent that there was some evidence [on] which the jury might reasonably reach [its] conclusion, and should not refuse to set it aside [when] the manifest injustice of the verdict is so plain and palpable as clearly to denote that some mistake was made by the jury in the application of legal principles. . . . Ultimately, [t]he decision to set aside a verdict entails the exercise of a broad legal discretion . . . that, in the absence of clear abuse, we shall not disturb." (Internal quotation marks omitted.) *Jackson* v. *Water Pollution Control Authority*, supra, 278 Conn. 702.

The plaintiff argues that the jury reasonably could not have believed that Gray's conversation with the radiologist could have "altered his thought that the herniation was probably in part free fragment." The plaintiff bases this argument on the fact that the official radiology report relied on by Gray makes no mention of free fragments. Also, the plaintiff claims that it was unreasonable for the jury to credit Gray's testimony that he adopted the radiology report because Gray stated that his concerns about the presence of a free fragment were based on changes in the plaintiff's symptoms and not MRI films. The defendants argue that there was sufficient evidence from which the jury reasonably could have concluded that Gray had altered his original diagnosis concerning the presence of the free fragment and concluded that one was not present. No actual evidence of a free fragment was presented. We agree with the defendants.

Gray admitted that several months prior to the plaintiff's surgery, he was concerned, on the basis of the

plaintiff's symptoms, that there might be a free fragment present and noted this concern in an orthopedic base form report. Gray also testified that subsequent to this report and prior to the surgery, he called a radiologist to review the results of the official radiology report. On the basis of this conversation and the radiology report, Gray testified that he concluded that a free fragment was not present. The jury was free to accept as true Gray's testimony and conclude that at the time of the surgery, he was not concerned about the presence of a free fragment. "It is settled that the trier of fact has the right to accept part and disregard part of the testimony of a witness." *Griffin* v. *Nationwide Moving & Storage Co.*, 187 Conn. 405, 422, 446 A.2d 799 (1982). "[T]he role of the trial court on a motion to set aside the jury's verdict is not to sit as a seventh juror, but, rather, to decide whether, viewing the evidence in the light most favorable to the prevailing party, the jury could reasonably have reached the verdict that it did." (Internal quotation marks omitted.) *Purzycki* v. *Fairfield*, 44 Conn. App. 359, 362, 689 A.2d 504 (1997), rev'd on other grounds, 244 Conn. 101, 708 A.2d 937 (1998). Therefore, we conclude that there was sufficient evidence from which the jury reasonably could have reached its conclusion and that the court acted within its discretion to deny the plaintiff's motion to set aside the verdict.[10]

Essentially, the plaintiff is asking this court to determine that Gray and Murphy were not credible. That is not the province of this court. Unless we find that there was no substantial evidence from which the jury reasonably could have reached its conclusion, we cannot disturb its decision. That is not this case.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[10] See footnote 9.